TEKER TORRES & TEKER, P.C.
SUITE 2A, 130 ASPINALL AVENUE
HAGÅTÑA, GUAM 96910
TELEPHONE: (671) 477-9891-4
FACSIMILE: (671) 472-2601

Attorneys for Plaintiff
*Debbie Ann Reyes Perez*

FILED
DISTRICT COURT OF GUAM

AUG 04 2009

JEANNE G. QUINATA
CLERK OF COURT

IN THE DISTRICT COURT OF GUAM

----------

| | |
|---|---|
| DEBBIE ANN REYES PEREZ, | ) CIVIL CASE NO. CV08-00007 |
| Plaintiff, | ) |
| vs. | ) **DECLARATION OF COUNSEL** |
| SUPERIOR COURT OF GUAM, | ) |
| Defendant. | ) |

----------

PHILLIP TORRES hereby declares as follows:

1. I am the attorney of record for Plaintiff, Debbie Ann Reyes Perez, and make this Declaration on personal knowledge of the facts stated in this Declaration *except* as otherwise indicated.

2. I would testify competently as to these facts if called by the Court.

3. I am licensed to practice law before all courts in Guam.

4. All exhibits referenced herein were exchanged and obtained in discovery and are known by both parties and their counsel.

5. Attached hereto as Exhibit "A" are true and correct copies of pages 87 and 88 taken from Debbie Ann P. Certeza's January 29, 2009 Deposition Transcript.

6. Attached hereto as Exhibit "B" is a true and correct copy of Plaintiff's Confidential April 19, 2006 Incident Report.

7. Attached hereto as Exhibit "C" is a true and correct copy of page 15 taken from Pito Q. Cruz's February 27, 2009 Deposition Transcript.

I declare under penalty of perjury under that the foregoing is true and correct.

DATED at Hagåtña, Guam, on August 4, 2009.

PHILLIP TORRES



IN THE DISTRICT COURT OF GUAM

| | |
|---|---|
| DEBBIE ANN REYES PEREZ, ) | CIVIL CASE NO. CV08-00007 |
| ) | |
| Plaintiff, ) | COPY |
| ) | |
| vs. ) | |
| ) | |
| SUPERIOR COURT OF GUAM, ) | |
| ) | |
| Defendant. ) | |

## DEPOSITION OF DEBBIE ANN P. CERTEZA

Taken on Behalf of the Defendant

BE IT REMEMBERED That, pursuant to the Federal Rules of Civil Procedure, the deposition of **DEBBIE ANN P. CERTEZA** was taken before Cecille A. Flores, a Certified Shorthand Reporter, on Thursday, the 29th day of January 2009, at 9:00 a.m. in the offices of Dooley Roberts & Fowler, Suite 201, Orlean Pacific Plaza, 865 South Marine Drive.

Flores Court Reporting
Suite 2E, Jugo Building

1  A    The impression I got was that he was going to talk to
2  Chief Pito and they were going to counsel Ecle so that he
3  would at least stop. That's why I went to him.
4  Q    It sounds like the only person in the world you ever
5  spoke to about these incidents would have been Jennifer Cunha
6  --
7  A    Yes.
8  Q    -- until after you filed your complaint, right?
9  A    Right.
10 Q    Then after you filed your complaint, then you spoke
11 with other Marshals about it, right?
12 A    What do you mean by other Marshals?
13 Q    Actually, did you ever speak with Val Cruz about what
14 had happened?
15 A    Prior to the complaint?
16 Q    After the complaint.
17 A    Only in the Chief's office.
18 Q    When was that occasion? When you filed your April
19 18th report?
20 A    Right. Right.
21 Q    What did she say to you?
22 A    She said that -- she told Chief, Chief I believe her
23 because Alan assaulted me too.
24 Q    What else did she say?
25 A    And the Chief sounded shocked. He said, what? When

```
 1   did this happen?  And so he asked Valerie to tell him what
 2   happened.
 3       Q    What did she say?
 4       A    She said that he grabbed her breasts and she told him
 5   to stop.
 6       Q    Did she say when this had happened?
 7       A    She did not give a date, no.
 8       Q    What else did she say?
 9       A    That she did tell him -- that was it.  That's all I
10   can recall.
11       Q    Have you ever spoken with Val since that time about
12   Alan Ecle?
13       A    Only the day after on the 19th, but just to tell her
14   that he was outside in the hallway.
15       Q    You talked about that earlier?
16       A    Yeah, just that.
17       Q    Other than those two conversations, have you ever
18   spoken with Val Cruz about Alan Ecle?
19       A    Later that afternoon.
20       Q    Which afternoon?
21       A    The 19th.  I had come back from lunch.  I actually
22   was pretty emotional during the lunch hour.  I didn't even
23   wanna come back to work, but I eventually came in, came in
24   like a half an hour late or so and I was in the office and I
25   didn't -- I didn't hear anything about him being placed on
```

## REPORTER'S CERTIFICATE

     I, Cecille A. Flores, a Certified Shorthand Reporter, hereby certify that **DEBBIE ANN P. CERTEZA** personally appeared before me at the time and place set forth in the caption hereof; that at said time and place I reported in stenotypy all testimony adduced and other oral proceedings had in the foregoing matter; that thereafter my notes were reduced to typewriting under my direction; and the foregoing transcript, pages 1 to 109, both inclusive, constitutes a full, true, and correct record of such testimony adduced and oral proceedings had and of the whole thereof.

     Witness my hand at Barrigada, Guam this 5th day of February 2009.

_____
Cecille A. Flores
Certified Shorthand Reporter
CSR No. FL-OR-EC-A197NA

# EXHIBIT B

JUDICIARY OF GUAM
Marshals Division
120 W. O'Brien Drive
Hagatna, Guam 96910

April 19, 2006

INCIDENT REPORT

TO: Pito Q. Cruz
Marshal of the Courts

VIA: Channels

FR: Deputy Marshal I

SUBJECT: CONFIDENTIAL

Sir:

While on duty, Deputy Marshal II Alan Ecle has physically assaulted me on numerous occasions. The first one taking place on my birthday (July 1st) in the year 2002/2003. We went to lunch for my birthday using one of the official vehicles, and on the way back, Marshal Ecle pulled off to the side of the road, in front of the Maina look-out point. He grabbed me, tried to kiss and touch me. I pushed and shoved him away, told him no, to stop, and asked what was wrong with him. I asked him to take me back to work. Because he had his firearm in his holster I was intimidated and terrified by him, so I didn't tell anyone. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

The other occasions occurred between the above date and his deployment to Africa. On three separate incidents, he came up from behind me, while I was seated in the control/monitor room and grabbed my breasts. I told him to stop, and tried to get away from him, but he held me so tightly against the chair that I couldn't get away. On each of those occasions, he shoved me away after I raised my voice in hopes that someone will hear me. Again, I

was aware that he had his firearm in his holster, and I was terrified of what he might do. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

Also, on two separate occasions, between the first incident and his deployment to Africa, Marshal Ecle grabbed me, pinned my arms to my side, lifted me off the ground and forcefully kissed me. I struggled to break loose and kept telling him to stop. He'd drop me and shove me away. Again, I was aware that he had his firearm in his holster, and I was terrified of what he might do. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

I always verbally let Marshal Ecle know that his advances were unwanted and to stop, each time they occurred. I felt it was sufficient to verbally stop him but he just seemed to ignore all my warnings and make attempts after long periods of time while appearing to calculate when to physically assault me whenever he deemed I was vulnerable. Again, I was painfully reminded that he carried a firearm in his holster, and I was terrified of what he may be capable of doing. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

I felt trapped and intimidated in the Marshal's Division, because I didn't want to have to face the embarrassment of my peers knowing about what was happening to me. I also didn't know who to trust, and I knew that an incident of this nature is very emotional and exhausting to deal with. I didn't report this to anyone, but I confided the incidents with DMI Jennifer Cunha but she never suggested that I seek help or report the incidents.

After Marshal Ecle's deployment, I no longer felt the anxiety over possibly having another incident.

Upon Marshal Ecle's return from deployment, he told me that he missed me and that he was trying to contact me several times. I started feeling very anxious because he also told me that he wanted me, and that he was going to have me. Again, I was painfully reminded that he carried a firearm in his holster, and I was terrified of what he may be capable of doing. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

During the Christmas holidays, although he knew I got a divorce and that I had a boyfriend, he still approached me and kept insisting by asking me when I was going to make time for him. I repeatedly told him that I would never make time for him and to leave me alone, I even verbally warned him that I would tell on him if he persisted to harass me and he would just laugh at me and smirk. Again, I was painfully reminded that he carried a firearm in his holster, and I was terrified of what he may be capable of doing. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

In early February 2006, Marshal Ecle again grabbed me, pinned my arms to my side, lifted me off the ground and forcefully kissed me. I struggled to break loose and yelled for him to stop. Again, he dropped me and shoved me away. I was increasingly and painfully reminded that he carried a firearm in his holster, and I was terrified of what he may be capable of doing. I was terrified every time I heard his voice at work and I always attempted to avoid him coming near me at every chance I could get.

On February 16, 2006, I met with Deputy Marshal III F.J. Taijeron of Special Investigations Unit to advise him of the incidents, and to file an informal complaint. At which time I expressed the anxiety and intimidation I was feeling every time I heard his voice at work, and that I always attempted to avoid him coming near me at every chance I could get. I also had indicated that I was terrified of what he may be capable of doing and that I strongly felt that Marshal Ecle would again sexually assault me.

On April 12, 2006, at around 1600-1630, I had to escort an inmate to Judge Lamorena's. When I got to the holding cell area, Marshal Ecle was there, and so was DMIII C. Datuin. I avoided him, by trying to go out to the court room, but I was told by Marshal Datuin to just stay in the back. While Marshal Datuin and I were having a personal discussion by the door way, Marshal Ecle approached us, but I didn't realize it until he stood directly across me (because I was looking down at the ground). I glanced up, and saw that he was staring at me, and it made me feel really uncomfortable. I then looked back down. At the first opportunity, I immediately exited from the holding cell area and remained in the courtroom where Marshal Ecle would be prevented from attacking me, staring at me or further harassing me.

On April 17, 2006, at 1600, I escorted a female traffic warrant to traffic court using the stairwell from the basement to the first floor. About three fourths of the way up, I felt really anxious, and when I looked up, Marshal Ecle was standing at the top of the stairwell staring down at me. I wanted to turn around and run or go another route, but my detainee kept walking up the stairs so I had no other choice but to follow and continue on. The way Marshal Ecle stared at me and because he had his firearm in his holster I was intimidated and terrified by him. During the night after work, I woke up several times because I had a nightmare. I dreamt that he was raping me, and then afterwards walked away laughing.

The morning of April 18, 2006, I reflected on all the past and present incidents with Marshal Ecle and I prayed so many times for it to just end. I felt uncontrollably depressed and cried every time I thought about each and every time Marshal Ecle physically and verbally assaulted me. As soon as I came in, I immediately tried to contact Marshal Taijeron, in person and via telephone, I even left a note on his door and I tried to alert him on his I-connect radio. I then felt so much anxiety in failed attempts to contact Marshal Taijeron that I called DMIII C. Roberto and inquired about Marshal Taijeron's whereabouts. I also indicated to Marshal Roberto that I needed to see Marshal Taijeron right away, on a serious matter as my anxiety increased because I couldn't stand Marshal Ecle making me feel so victimized and I couldn't stop myself from crying anymore. I then met up with Marshal Roberto during a break, and again inquired about the whereabouts of Marshal Taijeron. It wasn't until our conversation that I found out that Marshal Roberto was still assisting SIU, so I asked him to meet with me. He informed me that he needed to get approval from the Marshal of the Court because his current assignment was to train the newly appointed deputy marshals. After lunch, Marshal Roberto met with me at my assigned post and we discussed the matter and I couldn't stop crying. I was then relieved of my duty at Post 1 Bravo and had a meeting with the MOC, Pito Cruz, Supervisor R. Manglona, DMIII C. Roberto and Valerie Cruz (Marshal Division Secretary).

The Guam Police Department was called on my behalf so that I could file a formal complaint against Marshal Ecle. The responding GPD Officers were Officer Awa and Officer B.J. Cruz. The responding police officers after

briefly questioning me then asked me to go down to the Hagatna Precinct to fill out a written statement. I was escorted and accompanied by Marshal Roberto. After I completed my written statement GPD Officer Awa told me that he was informed of Marshal Ecle voluntarily coming to the precinct and Officer Awa assured me that he would phone me at home about the outcome of the GPD investigation. Upon leaving the precinct, I saw Attorney J. Canto sitting outside. When Marshal Roberto and I left, Marshal Roberto mentioned to me that Attorney Canto was just inquiring of Marshal Ecle's whereabouts. We then returned to the judicial building. I then met with the MOC who gave me verbal and written instructions to report to his office tomorrow morning.

When I arrived at my residence I awaited a call from GPD and could not sleep due to the whole situation and remembering GPD Officer Awa's assurance that he would call me which never happened.

Additionally, Attorney J. Canto is one of the partners for Associate Defense Advocate, a law firm that represented Xavier A. Tedtaotao, a co-defendant with Jesse F. Belen, in CF595-00. This is a case where I am one of the victims.

DEBBIE A. PEREZ
Deputy Marshal I

# EXHIBIT C

IN THE DISTRICT COURT OF GUAM

| | | |
|---|---|---|
| DEBBIE ANN REYES PEREZ | ) | CIVIL CASE NO. CV08-0007 |
| Plaintiff, | ) | |
| vs. | ) | |
| SUPERIOR COURT OF GUAM, | ) | |
| Defendant. | ) | |

DEPOSITION TRANSCRIPT

OF

# PITO Q. CRUZ

February 27, 2009



PREPARED BY: GEORGE B. CASTRO
**DEPO RESOURCES**
#49 Anacoco Lane
Nimitz Hill Estates
Piti, Guam 96915
Tel: (671) 688-DEPO (3376)

```
 1      Q    Okay.  While she was there talking to
 2 you, your secretary was there, right?
 3      A    Right.
 4      Q    What's her name?
 5      A    Valerie Cruz.
 6      Q    Okay.  Valerie Cruz had a conversation
 7 with Debbie regarding Allen Ecle.  Did you hear
 8 that conversation?
 9      A    I don't recall if I -- my office --
10 wow, that's a long time.  I couldn't recall.
11      Q    Okay.  So you may or may not have heard
12 it?
13      A    Right.
14      Q    Okay.  As the Chief Marshal, what
15 action did you take if any, after receiving the
16 complaint from Debbie Perez?
17      A    I initially told her to, you know,
18 after all those that was brought up to my
19 attention, I told her to be careful, you know,
20 when she's going out, or to take extra
21 security, you know, get our security up more on
22 traveling, where ever she's going and not to
23 meet with Ecle or stuff like that.
24      Q    Okay.
25      A    Or even not to talk to him about
```

REPORTER'S CERTIFICATE

I, **George B. Castro**, Court Reporter, do hereby certify the foregoing 50 pages to be a true and correct transcript of the audio recording made by me in the within-entitled and numbered case at the time and place as set forth herein.

I do hereby certify that prior to examination the deponent was duly sworn upon oath and that a request for review was not made; that thereafter the transcript was prepared by me or under my supervision.

I further certify that I am not a direct relative, employee, attorney or counsel of any of the parties, nor a direct relative or employee of such attorney or counsel, and that I am not directly or indirectly interested in the matters in controversy.

In testimony whereof, I have hereunto set my hand and seal of Court this 27th day of April, 2009.

COPY

George B. Castro